Filed 6/15/21 (mod.); pub. order 6/15/21 follows unmodified opn. (attached); reposted with mod. order

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARK AARON SORDEN,<br><br>    Defendant and Appellant. | D076458<br><br>(Super. Ct. No. SCN393022)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed May 18, 2021, is hereby modified as follows:

1.     On page 7, four lines from the bottom, at the end of the paragraph—i.e., immediately after "CPO."—add the following new footnote 4 and renumber the remaining footnotes:

> In a petition for rehearing, Appellant argues that Government Code section 68081 requires rehearing because the "theory" that the CPO cannot be collaterally attacked "was not briefed by either party." (Capitalization and bolding omitted.)  We disagree.  By its terms, Government Code section 68081 requires a rehearing to afford the parties an opportunity to provide supplemental

briefing only where the appellate court's decision is "based upon an issue which was not proposed or briefed by any party[.]" As interpreted and applied by our Supreme Court, "[Government Code s]ection 68081 does not require that a party actually has briefed an issue; it requires only that the party had the opportunity to do so." (*People v. Alice* (2007) 41 Cal.4th 668, 677.) Here, *Appellant* raised the issue by collaterally attacking the CPO without considering whether such an attack is allowed. As we explain in the text, *post*, it is not. "[T]he fact that [Appellant] d[id] not address an issue, mode of analysis, or authority that is . . . fairly included within the issues [*he*] raised does not implicate the protections of [Government Code] section 68081." (*Alice*, at p. 679.)

In any event, even if we were to grant rehearing to allow further briefing, the result would be no different. At part II. of his petition for rehearing, Appellant presented substantive arguments as to why his collateral attack on the CPO should have been considered. In declining to modify any portion of this part III.A. of the opinion, we have fully considered all of the arguments Appellant raised at part II. of his petition for rehearing.

2. On page 21, at the beginning of the fifth line, within the quotation, insert "[Family Code]" before the first word ("section"), so that the line begins, within the quotation: [Family Code] section 6320.

3. On page 31, replace the text of former footnote 19 with the following:

Nor can Appellant now argue that he was unable to present a defense to a violation of the CPO based on cellphone tracking, since *he* is the one who raised the issue in the trial court. The first indication of cellphone tracking came from Gloria, in response to a question from *Appellant's counsel* on cross-examination, regarding why she told Appellant she had been staying in Orange County. Further, on direct examination of Appellant, *Appellant's counsel* asked a question to which *Appellant* volunteered, "Honestly, I tracked her phone"—direct evidence that the

2

jury could consider in deciding whether he had violated the CPO.

Appellant's petition for rehearing is denied.

There is no change in judgment.

McCONNELL, P. J.

Copies to: All parties

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076458 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN393022) |
| MARK AARON SORDEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb, Judge.  Affirmed as modified and remanded with directions.

Matthew R. Garcia, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

Mark Aaron Sorden (Appellant) appeals from a judgment following his conviction for contempt of court for violating a Criminal Protective Order—Domestic Violence (CPO) issued in a prior action. (Pen. Code, § 166, subd. (c)(1)(B) (§ 166(c)(1)(B)); further undesignated statutory references are to this code.)

As we explain, Appellant did not meet his burden of establishing reversible error. In reaching this decision, to the extent Appellant has not forfeited appellate review, we will conclude: (A) Appellant may not collaterally attack the CPO in this action; (B) the trial court properly instructed the jury as to the meaning of "disturbing the peace" for purposes of the contempt conviction (§ 166(c)(1)(B)); (C) the trial court did not deny Appellant due process of law when it allowed the jury to consider evidence of cellphone tracking that was not presented at the preliminary hearing; (D) the trial court properly instructed the jury as to the meaning of "act of violence" for purposes of the conduct enhancement (§ 166, subd. (c)(1)); (E) the trial court was not required to give a unanimity instruction for the conduct enhancement (§ 166, subd. (c)(4)); and (F) without individual instances of trial court error, there can be no prejudice from "cumulative error." Finally, we will further conclude that, as Appellant and the Attorney General agree, because Senate Bill No. 136 (2019-2020 Reg. Sess.; Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020) (Senate Bill No. 136) applies retroactively, the two one-year sentence enhancements based on prior prison terms should be stricken from the judgment.

Accordingly, we will modify the judgment to strike the two one-year sentence enhancements and otherwise affirm the judgment.

2

# I. PROCEDURAL BACKGROUND

In February 2019, the district attorney filed a two-count information, charging Appellant with false imprisonment by violence, menace, fraud, or deceit (count 1; §§ 236, 237, subd. (a)) and the violation of a protective order issued in connection with a prior domestic violence conviction (previously identified as the CPO) (count 2; § 166, subd. (c)(1)). The second count also alleged that the violation occurred within seven years of a prior conviction of section 166, subdivision (c)(1), and involved an act of violence or a credible threat of violence. (§ 166, subd. (c)(4).) In addition, the information alleged that Appellant had served two prior prison terms. (Former § 667.5, subd. (b); Stats. 2018, ch. 423, § 65.)

At trial, the jury found Appellant guilty of count 2 (violation of the CPO) and found true the allegation that the offense involved an act of violence or a credible threat of violence. The jury was unable to reach a verdict as to count 1 (false imprisonment), and the court declared a mistrial and dismissed this count in response to the People's motion. Appellant then changed his plea to the allegations of the two prison priors and admitted their truth.

In August 2019, the trial court denied Appellant's requests both to reduce the conviction to a misdemeanor and to sentence Appellant to a term of probation. The court sentenced Appellant to a term of five years in prison, as follows: the upper term of three years on count 2 and consecutive one-year terms for each of the two prison priors.[1]

Appellant timely appealed.

---

[1] The abstract of judgment erroneously indicates that Appellant was convicted by a plea of guilty. We will direct that the abstract be corrected to reflect that Appellant was convicted by a jury.

3

## II. FACTUAL BACKGROUND

In May 2017, Appellant pled guilty to one count of violating a section 136.2 protective order (§ 166, subd. (c)(1)), admitting that he "violated a court order [he] knew was in place to prevent domestic violence." As part of a plea agreement, in part Appellant was required to comply with the terms of a criminal protective order with a "no negative contact" provision.

On the same date, the court entered a criminal protective order (previously identified as the CPO). Gloria G. is the "protected person"; and, as relevant to the present action, the CPO ordered that Appellant "must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of" Gloria.

The incident at issue occurred on September 24, 2018. At the time, Gloria and Appellant had been in a dating relationship for four years, living in a converted tool shed—which Appellant compared to "a cottage on the side of the house"—on East Alvarado Street in Fallbrook. Across the street from them, Frank A. lived in a studio apartment—which Frank described as a "bungalow, pool house" or "little guest house"—at the top of the driveway; his parents lived in the main house on the property.

Over a month earlier, in August 2018, Gloria "needed some space" from Appellant and left the East Alvarado cottage, moving in temporarily with people in Vista whom she referred to as Appellant's niece and nephew.[2] Gloria did not tell Appellant where she was and did not answer any of

---

[2] According to Appellant, he is not biologically related to either the "niece" or the "nephew." Appellant explained that the "nephew" is "a young man that [he] had taken under [his] wing for ten years" and the "niece" was the "nephew's" girlfriend.

Appellant's telephone calls; and she asked the nephew not to tell Appellant where she was. During this time period, Appellant came by Frank's residence once a week looking for Gloria.

At or around 10:00 p.m. on the night of September 24, 2018, Gloria arrived at Frank's apartment, explaining to him that she had left the month before because she needed some space from Appellant and still was hiding from him.

An hour or two later—i.e., shortly before midnight, as Gloria was waiting for a ride back to the apartment in Vista—Appellant arrived at Frank's studio and let himself in. Appellant and Gloria seemed surprised to see the other. Appellant asked Gloria to step outside so that they could talk. Frank and Appellant exchanged words—with Frank telling Appellant to stay outside, and Appellant telling Frank to mind his own business. During this exchange, Frank told Appellant that Gloria did not want to speak with him, that Gloria was leaving Appellant, and that Appellant should just "get over it." Although the evidence is not clear as to who first grabbed Gloria's arm, the evidence is consistent that, Appellant took one of her arms in an attempt to lead her outside, and Frank took her other arm in an attempt to keep her inside (as he thought she wanted). During this scuffle just inside the door of the studio apartment, Appellant punched Frank in the eye, and Frank returned the punch.

As Gloria was attempting to extricate herself from the middle of the men's physical altercation, her foot got stuck under the front door (which opened into the apartment), and she fell to the floor. Appellant helped Gloria get up and carried her outside. Concerned because the police had been called, Appellant lifted Gloria, placed her over his shoulder, and hauled her down Frank's driveway to the street. At the end of the driveway, as Gloria

5

screamed to be put down, Appellant placed Gloria on the ground. According to Gloria, she screamed because she was in extreme pain due to cancer.

By this time, a small crowd of neighbors had congregated near the bottom of Frank's driveway. Appellant drove away in his car, and a friend of Gloria's waited with her for the police to arrive.

## III.  DISCUSSION

In the present case, the jury found that Appellant violated section 166(c)(1)(B), which provides in relevant part:

> "(c)(1) . . . [A] willful and knowing violation of a protective order or stay-away court order described as follows shall constitute contempt of court, a misdemeanor, punishable by imprisonment in a county jail for not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both that imprisonment and fine:  [¶] . . . [¶] (B) An order issued pursuant to paragraph (2) of subdivision (a) of Section 1203.097."

In this regard, section 1203.097, subdivision (a)(2) (section 1203.097(a)(2)) provides in relevant part:

> "(a) If a person is granted probation for a crime in which the victim is a person defined in Section 6211 of the Family Code, the terms of probation shall include all of the following:  [¶] . . . [¶]  (2) A criminal court protective order protecting the victim from further acts of violence, threats, stalking, sexual abuse, and harassment[.]"

For purposes of section 1203.097(a)(2), Gloria qualifies as "a person defined in Section 6211 of the Family Code."[3]

---

[3]     Under Family Code section 6211, " 'Domestic violence' " includes "abuse" perpetrated against "A person with whom [Appellant] is having or has had a dating or engagement relationship."  (*Id.*, subd. (c).)

In the present action, for purposes of the section 166(c)(1)(B) conviction, the CPO is the section 1203.097(a)(2) criminal protective order that the jury found Appellant to have violated.

"It is the policy of our state that contempt citations not be taken lightly, especially criminal contempt[ ].  An alleged contemnor in this state is entitled to the full panoply of substantive and due process rights . . . ." (*People v. Kalnoki* (1992) 7 Cal.App.4th Supp. 8, 11 [appeal from misdemeanor contempt under former § 166, subd. (2)].)  "In the review of a contempt proceeding 'the evidence, the findings, and the judgment are all to be strictly construed in favor of the accused' "; and, contrary to general appellate procedure, " 'no intendments or presumptions can be indulged in aid of their sufficiency.' " (*Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1256 [review of criminal contempt judgment based on violation of injunction issued under Red Light Abatement Law].)

As we explain, here Appellant has not met his burden of establishing reversible error on appeal.

A.      *Appellant May Not Collaterally Attack the CPO in this Action*

Appellant presents two arguments on appeal that concern the scope of the CPO.  More specifically, he contends that violations of certain of the acts prohibited by the CPO—namely, disturbing the peace and surveillance—cannot form the basis of a contempt violation for purposes of section 166(c)(1)(B).  As we explain, we reject Appellant's arguments, since they are impermissible collateral attacks on the CPO.

1.      *Background; the May 2017 Action & Resulting CPO*

In early May 2017, the People filed a three-count misdemeanor complaint against Appellant (May 2017 Action).  Count 1, entitled "Violation

of Protective or Stay-Away Order, Domestic Violence or Elder Abuse" (bolding and some capitalization omitted), alleged in full:

> "On or about April 26, 2017, [Appellant] did willfully, knowingly and unlawfully violate a protective order and stay away court order issued pursuant to Penal Code section 136.2 in a pending criminal proceeding involving domestic violence, as defined in Penal Code section 13700, in violation of PENAL CODE SECTION 166(c)(l)."

The version of former section 136.2 that was applicable in May 2017 contained more than 35 separately identified subdivisions and paragraphs.[4] (Stats. 2016, ch. 86, § 220, eff. Jan. 1, 2017.) The record on appeal does not indicate the basis on which the court in the May 2017 Action issued the section 136.2 protective order—other than the allegation that it was issued "in a pending criminal proceeding involving domestic violence" as defined in section 13700.[5]

On May 3, 2017, as part of a formal plea agreement in the May 2017 Action, Appellant pled guilty to violating section 166, subdivision (c)(1). Appellant's violation in that action was under subdivision (c)(1)(A), which provides in relevant part:

> "(c)(1) . . . [A] willful and knowing violation of a protective order or stay-away court order described as follows shall constitute contempt of court, a misdemeanor, punishable by imprisonment in a county jail for not more than one year, by a fine of not more than one thousand dollars ($1,000), or

---

4 Current section 136.2 has been amended three times since May 2017. (Stats. 2017, ch. 270, § 1, eff. Jan. 1, 2018; Stats. 2018, ch. 805, § 1, eff. Jan. 1, 2019; Stats. 2019, ch. 256, § 6, eff. Jan. 1, 2020.)

5 Section 13700, subdivision (b) defines " 'Domestic violence' " as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."

by both that imprisonment and fine:  [¶]  (A) An order issued pursuant to Section 136.2."

As part of the negotiated plea, Appellant agreed to comply with the terms of the CPO.

    2.    *Law*

" 'As a general rule, the elements of contempt include (1) *a valid order*, (2) knowledge of the order, (3) ability to comply with the order, and (4) willful failure to comply with the order.' " (*Wanke, Industrial, Commercial, Residential, Inc. v. Keck* (2012) 209 Cal.App.4th 1151, 1168 (*Wanke*), italics added [alleged violation of a facially valid stipulated injunction].)  A willful and knowing violation of a court order like the CPO can be an act of criminal contempt (§ 166(c)(1)(B)), but only if the order is valid (*People v. Gonzalez* (1996) 12 Cal.4th 804, 816-817 (*Gonzalez*) [defendant's violation of civil public nuisance gang activity injunction]).

We begin with our Supreme Court's description of the "well settled [rule] in California that a void order cannot be the basis for a valid contempt judgment":

> "We established in *In re Berry* (1968) 68 Cal.2d 137, 147 (*Berry*), a case involving a misdemeanor contempt prosecution [under former section 166, subdivision (4)], that *'the violation of an order in excess of the jurisdiction of the issuing court* cannot produce a valid judgment of contempt [citations], and that the "jurisdiction" in question extends beyond mere subject matter or personal jurisdiction . . . .' Rather, ' "any acts which *exceed the defined power of a court* in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction." ' (*Ibid.*)" (*Gonzalez, supra*, 12 Cal.4th at p. 817, first & second italics added.)

Thus, a potential contemnor may collaterally challenge an underlying order that was entered " 'in excess of the jurisdiction of the issuing court.' " (*Ibid*.)

By contrast, a party may not defend against enforcement of a court order by contending merely that the order is legally erroneous. (*In re Marriage of Niklas* (1989) 211 Cal.App.3d 28, 35 (*Niklas*) ["A person may refuse to comply with a court order and raise as a defense to the imposition of sanctions that the order was beyond the jurisdiction of the court and therefore invalid, *but may not assert as a defense that the order merely was erroneous*" (italics added)]; *Signal Oil & Gas Co. v. Ashland Oil & Refining Co.* (1958) 49 Cal.2d 764, 776, fn. 6 (*Signal Oil*) [" 'An [order] duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within its jurisdiction, must be obeyed by them *however erroneous the action of the court may be*' " (italics added)].) In sum, only an erroneous order that is either "unconstitutional on its face" or "in excess of the issuing court's jurisdiction" is subject to collateral attack in a later contempt proceeding for violating the order. (*Gonzalez, supra*, 12 Cal.4th at p. 823.)

For example, in *Berry, supra,* 68 Cal.2d 137, the petitioners were found guilty of willfully violating a temporary restraining order that was "void on its face." (*Id*. at p. 150.) In the petitioners' habeas corpus action, the Supreme Court allowed a collateral challenge to the order, concluding that "the violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt . . . ." (*Id.* at p. 147; see *ibid*. [an "order constitutionally void on its face is issued in excess of jurisdiction and cannot sustain a contempt judgment based upon its violation"].)

By contrast, in *Signal Oil, supra,* 49 Cal.2d 764, the temporary restraining order on which the contemnor's contempt was based was validly

issued, but later became void following a court ruling which invalidated an agreement upon which both the temporary restraining order and the preliminary injunction were issued. (*Id*. at pp. 775-778.) Because the invalidity of those two orders was not apparent on their faces, any violation of the orders *up to the time the underlying agreement was declared void* was subject to the court's contempt authority:

> "At the time the [temporary restraining and preliminary injunction] orders in this case were issued, the court had jurisdiction over the parties and the subject matter, there was no claim that the procedural requirements of the injunction statute [under which the orders were issued] had not been met, and there was at least a prima facie showing of facts which would sustain the court's orders. Under the circumstances, these orders, although subsequently determined to be erroneous, were not void." (*Id*. at p. 776, fn. omitted.)

Stated differently, even where the underlying order is ultimately determined to be erroneous, such an order—*the violation of which will support a contempt finding*—does not become "a nullity." (*Id*. at p. 777.) That is because, as the court later explained in *Berry*, the temporary restraining order in *Signal Oil* "suffered from no jurisdictional defect because the invalidity of the agreement did not appear upon the face of the order." (*Berry*, *supra*, 68 Cal.2d at p. 148.) Thus, for purposes of determining noncompliance, "acts undertaken in violation of that order should therefore be given recognition." (*Ibid*.)

Accordingly, we proceed with the following succinct summary of the law provided by our colleagues in the Sixth District: "Although an order made in excess of the court's jurisdiction may not form the basis of a contempt order [citation to and quotation from *Gonzalez*, *supra*, 12 Cal.4th at p. 817], a party may not defy a legally erroneous court order and then challenge it collaterally in proceedings brought to enforce the order [citing *Wanke*, *supra*, 209 Cal.App.4th at p. 1172, & *Signal Oil*, *supra*, 49 Cal.2d at p. 776, fn. 6]."

11

(*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1080, fn. 13 (*Carrnshimba*).)

### 3. *Analysis*

#### a. *Disturbing Gloria's Peace*

In part, the CPO ordered Appellant not to "disturb the peace" of Gloria. During its deliberations, the jury submitted the following note to the court: " 'What is the legal definition of "disturbing the peace" as stated in . . . the [CPO?]" Without objection,[6] the court instructed the jury: " 'The plain meaning of disturbing the peace can be defined as "conduct that destroys the [mental] or emotional calm of the other party[." ]' "

Appellant's first argument on appeal is that neither section 166(c)(1)(B) nor section 1203.097(a)(2) "authorize[s] criminal liability to be premised on disturbing the peace." (Capitalization and bolding omitted.)

We begin with the understanding that Appellant was charged with violating section 166(c)(1)(B), and section 166(c)(1)(B) does not criminalize "disturb[ing] the peace." That subdivision of the statute is violated only by a "willful and knowing violation of . . . [a]n order issued pursuant to [section 1203.097(a)(2)]." (§ 166(c)(1)(B).) Based on the straightforward language of the statute, because the CPO was issued pursuant to section 1203.097(a)(2), *if* Appellant willfully or knowingly violated the CPO, *then* Appellant violated section 166(c)(1)(B). In the context of this argument, therefore, the only question is whether Appellant willfully or knowingly disturbed Gloria's peace.

---

6 The reporter's transcript indicates there was no objection to the court's proposed response. The court's minutes indicate that counsel "stipulate[d]" to the court's proposed response.

12

In responding to this question, Appellant does not challenge the substantiality of the evidence in support of a finding that he disturbed Gloria's peace. He challenges only whether "disturb[ing] the peace" is a valid restriction in a CPO issued under section 1203.097(a)(2). According to Appellant, "[t]he prohibited conduct in the CPO is . . . broader than that which is prohibited by section 1203.097." His objection is that the section 1203.097(a)(2) criminal protective order at issue here—i.e., the CPO—includes as a prohibited act "disturb[ing] the peace" of Gloria, yet section 1203.097(a)(2) does not include disturbing the peace of the victim among the expressly listed prohibited acts.

This argument fails for at least two independent reasons. Each is based on the acknowledgement in Appellant's opening brief on appeal that the trial court had the discretion—i.e., jurisdiction—to include as a term of probation that Appellant was prohibited from disturbing Gloria's peace.

First, Appellant's argument is an impermissible collateral attack on the CPO, a final order issued in the May 2017 Action. Appellant's complaint that the trial court in the May 2017 Action erred in issuing a condition of probation which is "broader than that which is prohibited by section 1203.097" is nothing more than the argument that the CPO is legally erroneous. However, with no suggestion that the CPO is void, Appellant is precluded from challenging the CPO in these contempt proceedings. (*Signal Oil*, *supra*, 49 Cal.2d at p. 776, fn. 6; *Wanke*, *supra*, 209 Cal.App.4th at p. 1172; *Gonzalez*, *supra*, 12 Cal.4th at p. 817; *Carrnshimba*, *supra*, 215 Cal.App.4th at p. 1080, fn. 13.)

Second, even if we were to consider Appellant's collateral attack on the CPO, contrary to Appellant's argument (for which he provides no authority), section 1203.097(a)(2) does not limit a domestic violence criminal protective

order only to those acts expressly identified in the statute. To the contrary, the statute merely provides a list of acts which *must* be included in a section 1203.097(a)(2) criminal protective order—namely, "further acts of violence, threats, stalking, sexual abuse, and harassment." (*Ibid*.) Neither the language of the statute nor our independent research suggests that the Legislature intended to limit the acts in a section 1203.097(a)(2) criminal protective order to those which must be included.[7] In fact, given that a section 1203.097(a)(2) criminal protective order is intended, at least in part, to protect a domestic violence victim from "further acts" of violence by the defendant who was granted probation in the prior criminal case, the "further acts" listed in section 1203.097(a)(2) should be construed broadly enough to include disturbing the peace.

b.  *Keeping Gloria Under Surveillance*

In part, the CPO ordered Appellant not to "follow, stalk" or "keep [Gloria] under surveillance." During its deliberations, the jury submitted the following note to the court:

> "Does the violence against the third party [which is required for a conviction of section 166(c)(1)(B)] have to be a <u>consequence</u> of the violation of [the] protective order in order to meet the criterion ('involved an act of violence') for the second part of charge #2?

> "For example, if we believe the protective order was violated by surveillance (tracking her phone), can the act of violence against Frank in front of Gloria be considered,

---

[7]  Appellant argues on appeal that trial counsel's assistance was constitutionally ineffective by failing to object to the lack of an instruction precluding guilt based on a finding that Appellant violated the CPO by disturbing Gloria's peace. We disagree. Trial counsel was not constitutionally ineffective by failing to mount an impermissible collateral attack on the CPO.

14

since Gloria was involved? Or, does the act of violence have to be directly related with the specific violation of the protective order (surveillance/tracking phone)[?]"

Without objection,[8] the court instructed the jury: " 'If you determine the protective order has been violated, an act of violence against someone other than the protected party [may] be considered only if you find it facilitated the commission of or completion of the violation.' "

Appellant argues that, because "surveillance/phone-tracking is not criminal conduct under section 1203.097," in response to the jury's question, "[t]he trial court should have instructed the jury that they could not find a violation of section 166[, subdivision ](c)(1)." Once again, Appellant does not challenge the substantiality of the evidence to support a finding that he surveilled Gloria, only that "surveillance" is not among the five specifically identified acts that are prohibited by section 1203.097(a)(2). In support of his argument, Appellant incorporates by reference his arguments related to the CPO's prohibition of disturbing Gloria's peace.

Accordingly, for the same reasons that we rejected Appellant's challenge to the "disturb[ing] the peace" language as a basis for a section 166(c)(1)(B) violation, we reject Appellant's suggestion that surveillance/phone-tracking cannot be a basis for a section 166(c)(1)(B) violation. First, because Appellant does not suggest that the CPO is void, Appellant's argument is an impermissible collateral attack on the CPO, a final order issued in the May 2017 Action. (*Signal Oil*, *supra*, 49 Cal.2d at p. 776, fn. 6; *Wanke*, *supra*, 209 Cal.App.4th at p. 1172; *Gonzalez*, *supra*, 12

---

8 The reporter's transcript indicates there was no applicable objection to the court's proposed response, whereas the court's minutes indicate that counsel "stipulate[d]" to the proposed response.

Cal.4th at p. 817; *Carrnshimba*, *supra*, 215 Cal.App.4th at p. 1080, fn. 13.) Second, even if we were to consider Appellant's collateral attack on the CPO, section 1203.097(a)(2) does not limit a criminal protective order only to those acts expressly identified in the statute. The statute merely provides a list of acts which *must* be included—namely "further acts of violence, threats, stalking, sexual abuse, and harassment" (§ 1203.097(a)(2))—with no indication that the list of prohibited acts is exclusive.[9] Finally, given the purpose of a section 1203.097(a)(2) criminal protective order, the "further acts" listed in section 1203.097(a)(2) should be construed broadly enough to include surveillance.

B.    *The Trial Court Did Not Err in Instructing the Jury as to "Disturbing the Peace"*

Appellant contends that, in response to a question from the jury, the court provided a "substandard explanation" of " 'disturbing the peace,' " resulting in an instruction that was "vague, overbroad and ambiguous." (Capitalization and bolding omitted.) In a related argument, Appellant complains that the jury instructions did not "establish a crucial element of the 'crime' "—namely " 'disturbing the peace.' " We are not persuaded.

1.    *Background*

With regard to the contempt of court allegations in count two (§ 166(c)(1)(B)), the court instructed the jury pursuant to CALCRIM No. 2701. During the jury instructions conference, in response to the court's

---

9    Appellant argues on appeal that trial counsel's assistance was constitutionally ineffective by failing to object to the lack of an instruction precluding guilt based on a finding that Appellant's surveillance of Gloria (by phone tracking) violated the CPO. We disagree. Trial counsel was not constitutionally ineffective by failing to mount an impermissible collateral attack on the CPO.

16

direct inquiry, Appellant agreed to this instruction without comment or objection.

As we introduced at part III.A.3.a., *ante*, during its deliberations, the jury submitted a note, asking the court, " 'What is the legal definition of "disturbing the peace" as stated in . . . the [CPO?]" The court discussed with counsel what disturbing the peace means in various contexts—i.e., criminal, civil, and family (domestic violence) law. The court gave counsel time to read the cases, statutes, and jury instructions discussed, and specifically asked counsel for their input. In response to its stated intention to tell the jury that "disturbing the peace" "may be properly understood as conduct that destroys the mental or emotional calm of the other party," the prosecutor expressly agreed, and defense counsel expressed no objection, to "submit[ting the matter] to the court."

Consistent with its intended response and counsel's stipulation, the court answered the jury's question as follows: " 'The plain meaning of disturbing the peace can be defined as "conduct that destroys the [mental] or emotional calm of the other party[." ]' " The court based its (stipulated) response principally on the holding and reasoning from *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483 (*Nadkarni*), which we discuss *post*.

2. *Law*

In a criminal case, the trial court has a sua sponte duty to instruct the jury on all general principles of law relevant to the issues raised by the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 73 (*Brooks*).) "Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015 (*Castillo*); accord, *People v. Ramirez* (2015) 233 Cal.App.4th 940, 949 [while no specific jury instruction is ever required, the

17

trial court has a duty to ensure that the instructions given "provide a complete and accurate statement of the law"].)

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Instructional error requires reversal of the judgment only if it resulted in a miscarriage of justice—which, in this context, means that there is a reasonable probability that the defendant would have fared better in the absence of the error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Cavitt* (2004) 33 Cal.4th 187, 209 [erroneous limiting instruction subject to *Watson* harmless error analysis[10]].)

---

[10] Appellant argues that the applicable harmless error standard is under *Chapman v. California* (1967) 386 U.S. 18, pursuant to which federal constitutional error is harmless only if the error was harmless beyond a reasonable doubt (*id.* at p. 24). According to Appellant, *Chapman* applies, because the alleged instructional error in defining "disturbing the peace": "results in a defect in the description of an element of the crime"; or "reliev[es] the state of its obligation to prove every element of the charged offense beyond a reasonable doubt." That is not the appropriate standard, however, because, as we explained at part III.A.3.a., *ante*, "disturbing the

18

3.    *Analysis*[11]

The trial court in the present case based its definition of "disturbing the peace" on the definition given to the phrase in *Nadkarni, supra*, 173 Cal.App.4th at pages 1495-1499.

In *Nadkarni,* a former wife applied for and received a temporary restraining order and order to show cause against her former husband under the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.). (*Nadkarni, supra*, 173 Cal.App.4th at p. 1488.)  At the show cause hearing, the trial court dismissed the application on the basis that the former husband's conduct—namely, accessing the former wife's email account and copying confidential emails—was insufficient to constitute abuse within the meaning of the DVPA.  (*Ibid*.)  The appellate court reversed, ruling that the former wife's application was "facially sufficient" under the DVPA.  (*Ibid*.)  More specifically, the court held that, for purposes of the DVPA, " ' "abuse" ' " includes " 'disturbing the peace of the other party' " and proceeded to define

_____

peace" is not an element of the crime of contempt of court for willfully violating a criminal protective order (§ 166(c)(1)(B)).

[11]    The Attorney General suggests that Appellant forfeited a challenge to the definition of "disturbing the peace" by failing either to object or to request clarifying or amplifying language in the trial court.  (*People v. Riggs* (2008) 44 Cal.4th 248, 309; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Nonetheless, as the Attorney General later acknowledges, where (as here) the court "does choose to instruct, it must do so correctly." (*Castillo, supra*, 16 Cal.4th at p. 1015.)  Thus, we reject Appellant's suggestion that trial counsel's failure to object was constitutionally ineffective and proceed to the merits.

19

" 'disturbing the peace' " for purposes of abuse under the DVPA.[12] (*Id.* at p. 1494.)

As the *Nadkarni* court explained:

> "To determine the plain meaning of statutory language, we may resort to the dictionary. 'When attempting to ascertain the ordinary, usual meaning of a word [in a statute], courts appropriately refer to the dictionary definition of that word.' [Citation.] The ordinary meaning of 'disturb' is '[t]o agitate and destroy (quiet, peace, rest); to break up the quiet, tranquility, or rest (of a person, a country, etc.); to stir up, trouble, disquiet.' [Citation.] 'Peace,' as a condition of the individual, is ordinarily defined as 'freedom from anxiety, disturbance (emotional, mental or spiritual), or inner conflict; calm, tranquility.' (*Ibid.*) Thus, the plain meaning of the phrase 'disturbing the peace of the other party' in [Family Code] section 6320 may be properly understood as *conduct that destroys the mental or emotional calm of the other party*." (*Nadkarni, supra,* 173 Cal.App.4th at p. 1497, italics added; see *ibid.* [this "interpretation of the phrase 'disturbing the peace of the other party' . . . comports with the legislative history of the DVPA"].)

Under this definition, the Court of Appeal had no difficulty concluding that "the plain meaning of the phrase 'disturbing the peace' . . . may include, as abuse within the meaning of the DVPA, a former husband's alleged conduct in destroying the mental or emotional calm of his former wife by accessing,

---

[12]    At the time of the *Nakdarni* opinion, Family Code former section 6203, subdivision (d) defined " 'abuse' " to include "any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320" (see Fam. Code, § 6203, subd. (4)); and Family Code section 6320 provided in part that the court may issue an "order enjoining a party from . . . *disturbing the peace* of the other party." (Italics added; see *Nadkarni, supra,* 173 Cal.App.4th at p. 1494.)

reading and publicly disclosing her confidential emails." (*Nadkarni, supra,* 173 Cal.App.4th at p. 1498.)

The *Nadkarni* court's definition has been applied consistently since 2009: " ' "[T]he plain meaning of the phrase 'disturbing the peace' in section 6320 may include, as abuse within the meaning of the DVPA, [an alleged abuser's] conduct in destroying the mental or emotional calm of his [alleged victim]." ' " (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 853; accord, *McCord v. Smith* (2020) 51 Cal.App.5th 358, 364; *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12 (*Curcio*); *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602; *In re Bruno M.* (2018) 28 Cal.App.5th 990, 997; *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 401; *Altafulla v. Ervin* (2015) 238 Cal.App.4th 571, 579; *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820; *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424; *Gou v. Xiao* (2014) 228 Cal.App.4th 812, 817; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146-1147 (*Burquet*) [*Nadkarni*'s interpretation of " 'disturbing the peace of the other party' " under the DVPA "is well reasoned"].)

We agree with the *Nadkarni* court's definition of "disturbing the peace" and conclude that the trial court accurately instructed the jury in this case. We are not persuaded by Appellant's arguments to the contrary.

Initially, Appellant argues that, despite the foregoing authorities, "there are no Criminal Law cases that have adopted this definition."[13] Accordingly, Appellant continues, "how was [A]ppellant to know prior to this jury instruction that the prohibited conduct was the Family Law definition of disturbing the peace and not the Criminal Law definition in section 415?

---

[13] Appellant's statement is incorrect. A more accurate statement would be that there are no *published* appellate decisions in which this definition has been applied in criminal cases.

21

When the CPO was imposed . . . back in 2017, did the trial court notify [A]ppellant that disturbing the peace meant 'destroying the mental or emotional calm of [Gloria]?'" For a number of reasons, this objection does not help Appellant.

First, merely asking rhetorical questions about proceedings in 2017 in a different case does not suggest, let alone establish error; instead, it results in a forfeiture of the issue(s) by failing to "provide legal argument and citation to authority." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 (*Bryant*).) Second, contrary to Appellant's argument, section 415 does not contain a definition of "disturbing the peace."[14] Third, the concept "of disturbing the peace as set forth in section 415 . . . is not applicable to the meaning of the phrase 'disturbing the peace of the other party' as used in the DVPA." (*Burquet, supra*, 223 Cal.App.4th at p. 1146.) Fourth, there would have been no reason to include a section 415 definition of "disturbing the peace" in the CPO, since a violation of section 415 is a crime *regardless of the CPO*. Fifth, in May 2017 when Appellant agreed to the terms of probation reflected in the CPO, *Nadkarni, supra*, 173 Cal.App.4th 1483; *Burquet, supra*, 223 Cal.App.4th 1140; and more than a half dozen of the other authorities included in the string citation, *ante*, were established law without

---

14    Section 415 requires criminal punishment for: "(1) Any person who unlawfully fights in a public place or challenges another person in a public place to fight. [¶] (2) Any person who maliciously and willfully disturbs another person by loud and unreasonable noise. [¶] (3) Any person who uses offensive words in a public place which are inherently likely to provoke an immediate violent reaction."

dissent, disagreement, or criticism.[15]  Finally, consistent with his presentation in the trial court, on appeal Appellant does not suggest a definition that he considers applicable.

Appellant next argues that "[t]he definition [of 'disturbing the peace'] in this case was . . . broader than *Nadkarni* and its progency [*sic*], because it allowed the jury to find [A]ppellant disturbed [Gloria's] peace based on *any* conduct committed by [A]ppellant."  Since the instruction given by the trial court here was *identical* to the definition provided in *Nadkarni, supra,* 173 Cal.App.4th at page 1497 ("conduct that destroys the mental or emotional calm of the other party"), the instruction here necessarily was not broader than the definition in *Nadkarni*.  Thus, Appellant does not convince us that the court here erred in instructing the jury with a definition of "disturbing the peace" consistent with *Nadkarni*.

Appellant next raises of number of questions and comments regarding what he contends is the inadequacy of the court's response to the jury's inquiry.  They include:  "what standard the jury should judge whether one's

---

15     On appeal, Appellant tells us that the definition of "disturbing the peace" in *Nadkarni* "has been limited by subsequent cases, such as *Curcio*[, *supra,* 47 Cal.App.5th at p. 13]."  With no further argument or legal authority, Appellant has forfeited appellate consideration of the issue.  (*Bryant, supra,* 60 Cal.4th at p. 363.)

Even if we were to reach the merits of the argument, the result would be no different.  In *Curcio*, the court expressly set forth the *Nadkarni* standard, quoting from and citing *Nadkarni* as follows:  "[The alleged abuser] could be enjoined under the DVPA for disturbing [the alleged victim's] peace through *conduct causing 'destruction of her mental or emotional calm.'* (*Nadkarni, supra,* 173 Cal.App.4th at pp. 1497, 1499.)"  (*Curcio, supra,* 47 Cal.App.5th at p. 12, italics added.)  The *Curcio* court then applied that standard, concluding that the evidence *in that case* did not meet the *Nadkarni* standard; the court did not criticize, comment on, or otherwise limit this well-established definition.  (*Id.* at pp. 12-13.)

23

'emotional calm' was destroyed:  subjective or objective?"; "what mental state was required in order to 'destroy one's emotional calm[?]'  Can one negligently 'destroy the emotional calm' of another party?"; and "one may question the propriety or wisdom of lifting definitions derived from Family Law into the criminal sphere."  However, due to Appellant's failure to present reasoned argument and legal authorities in support of the questions and comments he presents here, Appellant forfeited our consideration of them in this appeal.  (*Bryant*, *supra*, 60 Cal.4th at p. 363.)  As we introduced *ante*, simply posing questions on appeal neither presents issues for appellate review nor establishes reversible error.

Throughout his presentation on appeal, Appellant confuses and conflates a willful violation of an order issued pursuant to section 1203.097(a)(2) and whether the violation itself must also be a crime.  Only the former—here, a violation of the CPO—needs to be proven to establish criminal contempt under section 166(c)(1)(B).  The statute contains no requirement that the violation of the section 1203.097(a)(2) order be a crime, and we will not read one into the statute.  The court issued the CPO pursuant to section 1203.097(a)(2), which limits its application to cases in which the defendant "is granted probation for a crime in which *the victim is a person defined in Section 6211 of the Family Code*."  (Italics added.)  Family Code section 6211 is part of the DVPA (*id.*, § 6200 et seq.) and defines " 'Domestic violence' " as "abuse perpetrated against . . ." a person like Gloria at the time the court issued the CPO.  For this reason, the trial court did not err in using a plain-meaning definition of "disturbing the peace" that is consistently and uniformly applied in DVPA cases.  As we explained at part III.A.3.a., *ante*, "disturbing the peace" is not an element of the crime of

24

contempt of court for willfully violating a section 1203.097(a)(2) protective order under section 166, subdivision (c)(1).

C.  *The Trial Court Did Not Err in Allowing the Jury to Consider Evidence of Cellphone Tracking Not Presented at the Preliminary Hearing*

Appellant argues that he was denied due process of law by lack of notice of the charges against him when the court allowed the jury to consider evidence of an alleged violation of the CPO (i.e., cellphone tracking) not presented at the preliminary hearing. We disagree.

1.  *Background*

At the preliminary hearing, there was no evidence of Appellant's tracking of Gloria's cellphone. At the close of the preliminary hearing, the prosecutor argued that Appellant had violated the CPO by the physical confrontation at and outside Frank's apartment on the night of September 24, 2018.

During trial, on direct examination, Appellant testified that, as a result of tracking Gloria's cellphone, he knew exactly where she had been staying during the time she had moved in temporarily with the people whom she referred to as Appellant's niece and nephew. On cross-examination, Appellant confirmed that he had been tracking Gloria's cellphone. During closing argument, in attempting to persuade the jury that Appellant violated the CPO, the prosecutor again emphasized the details of the physical confrontation at and outside Frank's apartment. *In addition*, the prosecutor noted that Appellant "got on the stand and admitted that he stalked [Gloria] for 35 days. He was tracking her phone."

During its deliberations, the jury submitted a note related to the alleged contempt, which for purposes of section 166, subdivision (c)(4), required, in part, proof that the alleged violation of the CPO "involv[ed] an act of violence or 'a credible threat' of violence." As part of the note, the jury

25

asked the following questions: "[I]f we believe the [CPO] was violated by surveillance (*tracking her phone*), can the act of violence against Frank in front of Gloria be considered, since Gloria was involved? Or, does the act of violence have to be directly related with the specific violation of the protective order (surveillance/*tracking phone*)[?]" (Italics added.)

Without an objection relating to the cellphone tracking,[16] the court instructed the jury: " 'If you determine the protective order has been violated, an act of violence against someone other than the protected party [may] be considered only if you find it facilitated the commission of or completion of the violation.' "

Although these and the related questions in the jury's note all had to do with proof of violence for purposes of the enhancement (§ 166, subd. (c)(4)), on appeal Appellant emphasizes that, based on the questions, at least some of the jurors had been considering Appellant's phone tracking as the underlying violation of the CPO. In responding to the note, Appellant's argument continues, the trial court erred in failing to instruct the jury that it could not base the violation of the CPO on phone tracking because the People did not present any evidence of phone tracking at the preliminary hearing.

2.    *Law*

Based on the constitutional requirement "that one accused of a crime must be 'informed of the nature and cause of the accusation[,]' . . . [d]ue

---

16    The reporter's transcript indicates that the court and counsel discussed the note, the various questions in the note, and a response proposed by the court. Defense counsel "continue[d] the objection that [she had] from [two days earlier]"—without articulating what it was—but there was no issue as to surveillance or cellphone tracking two days earlier. The prosecutor agreed to the court's proposed response. The court's minutes indicate that counsel "stipulate[d]" to the court's proposed response.

process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*), quoting U.S. Const., 6th Amend.) As our Supreme Court explained, this right to defend oneself "has two related components, namely, the right to *notice* of the charges, and the right to *present a defense* to those charges." (*Ibid*.)

In this context, the information " 'tells a defendant *what kinds of offenses* he is charged with and states the number of offenses that can result in prosecution.' " (*People v. Pitts* (1990) 223 Cal.App.3d 606, 904, 908 (*Pitts*), superseded by statute on another ground, italics added.) By contrast, the preliminary hearing transcript "afford[s the defendant] notice of the time, place and circumstances of [*the*] *charged offenses*" in the information. (*Id.* at p. 908, italics added.)

3. *Analysis*

Appellant claims that, because he was not put on notice of the charges against him *based on cellphone tracking*, he was denied due process when the court allowed the jury to consider evidence of cellphone tracking that was not presented at the preliminary hearing.

As an initial consideration, Appellant forfeited appellate review of this argument by not objecting or otherwise raising the issue in the trial court. (*People v. Hoyt* (2020) 8 Cal.5th 892, 911 (*Hoyt*), cert. den. *sub nom. Hoyt v. California* (2020) __ U.S. __, 141 S.Ct. 285 ["Defendant did not raise this argument in the trial court, which would ordinarily bar him from raising it on appeal."].) In particular, a defendant who fails to object at trial that the evidence showed offenses different from those at the preliminary hearing forfeits appellate consideration of the contention that the defendant lacked

27

adequate notice of the charges. (*People v. Newlun* (1991) 227 Cal.App.3d 1590, 1603-1604 [the defendant was charged with lewd and lascivious conduct; evidence of sodomy, which was not presented at the preliminary hearing, was presented at trial; by failing to object at trial, the defendant forfeited the appellate argument].)

Even if we were to reach the merits, the result would be no different.[17] Appellant was *charged* with the crime of contempt in violation of section 166(c)(1)(B). As relevant to Appellant's lack-of-notice argument, the element of the crime at issue is "a willful and knowing violation of a protective order . . . [¶] . . . [¶] issued pursuant to [section 1203.097(a)(2)]." (§ 166(c)(1)(B).)

After quoting from *Jones*, *supra*, 51 Cal.3d at page 317, our colleagues in Division Three recently summarized: "A defendant therefore cannot be prosecuted for an offense not shown by the evidence at the preliminary hearing[.]" (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 303.) Appellant does not contend that he was convicted of an offense not shown by the evidence at the preliminary hearing; nor does he suggest that the evidence at the preliminary hearing did not establish the offense. Instead, Appellant argues that he cannot be convicted of an offense based on evidence not presented at the preliminary hearing. The error in Appellant's reasoning is that he is focusing on *the evidence* presented at the preliminary hearing and at trial (which was different), rather than on *the offense* alleged in the information, shown at the preliminary hearing, and proven at trial (all of which was the same, i.e., a violation of § 166(c)(1)(B)).

---

[17] For this reason, we reject Appellant's suggestion that trial counsel's assistance was constitutionally ineffective by failing to object to the lack of an instruction regarding Appellant's tracking of Gloria's cellphone.

Appellant's reliance on *People v. Burnett* (1999) 71 Cal.App.4th 151 (*Burnett*) is misplaced.  There, the jury convicted the defendant of being a felon in possession of a firearm, and the principal issue on appeal was whether he was tried for an offense different from the one charged in the information and supported by the evidence at the preliminary hearing.  (*Id.* at pp. 155-156, 164.) The information alleged that the defendant possessed a " '.38[-]caliber revolver' " at a specified location on a specified date, and at the preliminary hearing witnesses described a specific incident on the specified date during which the defendant possessed a .38-caliber revolver.  (*Id.* at pp. 156, 164.)  At trial, in addition to the evidence of possession of a .38-caliber revolver, a different witness (who was not present during the incident described at the preliminary hearing) provided evidence, not mentioned at the preliminary hearing, that on the same date—but at a *different* time with *different* people present—the defendant possessed a *different* firearm, i.e., a .357-caliber revolver.  (*Ibid.*)  The court allowed the prosecutor to amend the information "to delete the words '.38 caliber' ";[18] and in closing, the prosecutor argued that the defendant possessed two different guns, one during each of the two different incidents on January 8 and that the jury could convict "on the basis of either one, as long as all the jurors agreed which act the conviction was based upon." (*Id.* at pp. 164-165, 169.)  This was error.  The defendant had been "charged with only one violation . . . , and the evidence presented at the preliminary hearing portrayed only a single

_____

[18]  The trial court may allow an amendment of an information "for any defect or insufficiency, at any stage of the proceedings."  (§ 1009.)  That said, section 1009 further provides that an information "cannot be amended . . . so as to charge an offense not shown by the evidence taken at the preliminary examination."

incident" involving specific witnesses and a .38-caliber revolver. (*Id.* at p. 170.) "No hint was given at the preliminary hearing that a *different* witness had seen [the defendant] in possession of a *different* firearm at a *different* time on the same date. . . . The offense described by [the new witness at trial]—possession of the .357 magnum revolver . . . —was never the subject of a preliminary hearing." (*Id.* at pp. 170-171, italics added.)

In the present case, the information charged Appellant with violating the CPO on September 24, 2018; and the evidence at the preliminary hearing (which did not include evidence of cellphone tracking) supported findings that Appellant violated the CPO on September 24, 2018. At trial, the jury found that Appellant violated the CPO on September 24, 2018—*as charged in the information*—even though the evidence at trial included evidence that was not presented at the preliminary hearing (i.e., cellphone tracking). Thus, unlike *Burnett*, *supra*, 71 Cal.App.4th 151, here the charge, the evidence at the preliminary hearing, and the evidence at trial (including evidence that was not presented at the preliminary hearing) all dealt with a violation of the CPO on September 24, 2018, as charged in the information.

Appellant confuses *whether* there was a violation of the CPO with *how* the CPO was violated. The charge against Appellant was under section 166(c)(1)(B), which requires proof of a violation of a domestic violence protective order; but section 166 does not require an allegation or a finding of *how* the defendant violated the order. As applicable here, Appellant argues that he had "no notice he was being charged with surveilling [Gloria] based on tracking her phone." However, at no time—not in the information, at the preliminary hearing, or during the trial—did the People charge Appellant with surveilling Gloria. At all times, consistent with the language of section 166(c)(1)(B), the information charged Appellant only with violating

the CPO on or about September 24, 2018. Significantly, Appellant does not suggest that the evidence at the preliminary hearing failed to put him on notice of the charge of willfully and knowingly violating the CPO on September 24, 2018.[19]

For these reasons, neither Appellant's "right to notice of the charges" nor Appellant's "right to present a defense to those charges," as required by *Jones*, *supra*, 51 Cal.3d at page 317, was adversely affected by the evidence of surveillance that Appellant presented in his testimony at the trial. In the language of *Pitts*, *supra*, 223 Cal.App.3d at page 904, in this case Appellant received " 'all the notice the Constitution requires' " because the evidence presented at the preliminary hearing: (1) " 'supports the number of offenses charged against [Appellant]' "—i.e., *one violation of section 166(c)(1)(B)*; and (2) " 'covers the timeframe(s) charged in the information' "—i.e., *September 24, 2018*.

Accordingly, the trial court did not deny Appellant due process of law when it allowed the jury to consider evidence of cellphone tracking that was not presented at the preliminary hearing.

D.  *The Trial Court Did Not Err in Instructing the Jury Regarding "an Act of Violence"*

The jury found true the section 166, subdivision (c)(4) allegation that Appellant's violation of the CPO "involved an act of violence" (at times,

---

[19]    Indeed, given that the first indication of cellphone tracking (i.e., surveillance of Gloria in violation of the CPO) came from Appellant's testimony during direct examination by his own attorney, Appellant cannot now argue that he was unable to present a defense to a violation of the CPO based on cellphone tracking.

31

subdivision (c)(4) allegation or subdivision (c)(4) enhancement allegation).[20]

Appellant argues that, for purposes of the prosecution's case in establishing the truth of this allegation, the trial court erred in allowing the jury to consider (1) uncharged acts of violence against parties not subject to the CPO (i.e., Frank) and (2) acts of violence that did not occur "contemporaneous[ly] with" the violation of the CPO. We are not persuaded.

1.      *Background*

A violation of section 166, subdivision (c)(1), is a misdemeanor. However, for purposes of the subdivision (c)(4) allegation, as relevant to the issues in this appeal, a second conviction of violating subdivision (c)(1) subjects the defendant to punishment as a felony upon a showing of specified conduct—namely, "an act of violence." In this regard, without objection, the court instructed the jury as follows: "If you find the defendant guilty of violating a court order, you must then decide whether the People have proved that the defendant's conduct involved an act of violence." (See CALCRIM No. 2703.)

During its deliberations, the jury sent the court a number of notes, two of which Appellant contends are relevant to the showing required to establish "an act of violence" for purposes of the subdivision (c)(4) enhancement

---

[20]    Section 166, subdivision (c)(4) provides in full: "A second or subsequent conviction for a violation of an order described in paragraph (1) occurring within seven years of a prior conviction for a violation of any of those orders and involving an act of violence or 'a credible threat' of violence, as provided in subdivision (c) of Section 139, is punishable by imprisonment in a county jail not to exceed one year, or in the state prison for 16 months or two or three years." In the present action, the parties agreed to omit the reference to " 'a credible threat' " on the basis that there was no evidence at trial of merely a credible threat of violence.

32

allegation. The jury's two notes and the court's two responses provide as follows:

### JURY NOTE NO. 2

Jury's Note:
" 'Does violence in the commission of violating the restraining order have to be committed against Gloria — or can it be against others as well[?']"

Court's Response:
" 'Conduct involving an act of violence against someone other than the protected party, may only be considered if you find such conduct occurred after the defendant had violated the court order.' "

### JURY NOTE NO. 3

Jury's Note:
" 'Question about charge #2 [(§ 166(c)(1)(B)]

" 'Does the violence against the third party have to be a consequence of the violation of protective order in order to meet the criterion ("involved an act of violence") for the second part of charge #2?

" 'For example, if we believe the protective order was violated by surveillance (tracking her phone), can the act of violence against Frank in front of Gloria be considered, since Gloria was involved? Or, does the act of violence have to be directly related with the specific violation of the protective order (surveillance/tracking phone)[?']"

Court's Response:
" 'If you determine the protective order has been violated, an act of violence against someone other than the protected party [may] be considered only if you find it facilitated the commission of or completion of the violation.' "

Approximately a half day after submitting note No. 3, the jury found Appellant guilty of contempt in violation of section 166(c)(1)(B) and found true the subdivision (c)(4) allegation that the contempt "involved an act of violence."

2. *Law*

"In the construction of a statute the intention of the Legislature . . . is to be pursued, if possible[.]" (Code Civ. Proc., § 1859.) The provisions of the Penal Code "are to be construed according to the fair import of their terms, with a view to effect [the code's] objects and to promote justice." (§ 4.)

Thus, when we interpret a Penal Code statute, "our 'fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' . . . 'Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.' " (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105, citation omitted.) " 'If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' " (*Id.* at p. 1106.)

The trial court's interpretation of a statute—here, section 166, subdivision (c)(4)—is a question of law which we review de novo. (*People v. Jimenez* (2020) 9 Cal.5th 53, 61.)

With regard to the applicable law related to jury instructions, we incorporate by reference our discussion at part III.B.2., *ante*.

3. *Analysis*

a. *Violence Against a Third Party*

Appellant's first objection to the court's responses to the jury's note Nos. 2 and 3 is that, for purposes of the subdivision (c)(4) enhancement, the instructions allowed the jury to consider acts of violence against Frank—or against anyone other than Gloria, as the protected party under the CPO.

Notably, in his appellate briefing, Appellant concedes the "the lack of direct authority" for his position.

According to Appellant, section 166, subdivision (c)(4) is unclear and ambiguous, because it is susceptible to two constructions. More specifically, Appellant reasons: Because the statute does not expressly state whether the "act of violence" must be directed to the protected party (here, Gloria) and/or to a nonprotected third-party (e.g., Frank), the statute is susceptible to multiple interpretations. We describe the situation differently: *Because* the Legislature did not require that the act of violence be directed to the protected party in the subdivision (c)(4) enhancement, we will not read in a limitation or requirement not included by the Legislature. There is no ambiguity in the language used; the Legislature did not limit or otherwise qualify the potential victim(s) of a probationer's "act of violence" for purposes of proving the subdivision (c)(4) enhancement.

Where, as here, a statute sets a general rule without including exceptions or limitations (like § 166, subd. (c)(4)), "courts may not insert qualifying provisions not intended by the Legislature." (*People v. Goodson* (1990) 226 Cal.App.3d 277, 281-282; see *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75 [courts have " ' "no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed" ' "].) Courts may only decline to follow the plain meaning of a statute when to do so would "frustrate[ ] the manifest purposes of the legislation as a whole or le[a]d to absurd results." (*People v. Belleci* (1979) 24 Cal.3d 879, 884; accord, *People v. Betts* (2020) 55 Cal.App.5th 294, 298 ["We will follow th[e plain] meaning unless doing so would lead to absurd results the Legislature did not intend"].) Here, Appellant has not attempted to explain how an application of the plain

language of section 166, subdivision (c)(4), would either frustrate the legislative purpose behind the statute or result in absurd consequences.

Appellant suggests that, because section 166, subdivision (c)(4), "is part of a statutory scheme that is designed to protect domestic violence victims," the conduct enhancement allegation relating to violence must be directed *to the domestic violence victim*. However, the premise for Appellant's argument is wrong; thus, his conclusion does not follow. The statutory scheme associated with criminal contempt is found at section 166, subdivision (c)(1) of *the Penal Code* at part 1 ("Of Crimes and Punishments"), title 7 ("Of Crimes Against Public Justice"), chapter 7 ("Other Offenses Against Public Justice"). More specifically, the legislative purpose behind section 166—i.e., the crime of contempt—is " ' "to enable the courts to vindicate their authority and maintain the dignity and respect due to them[.]" ' " (*People v. Partee* (2020) 8 Cal.5th 860, 874 (*Partee*) [§ 166, subd. (a)(6) (refusal to comply with a valid subpoena)]; accord, *Gonzalez, supra*, 12 Cal.4th at p. 816 [§ 166, subd. (a)(4) (willful disobedience of an " 'order *lawfully* issued by any court' ")]; *In re McKinney* (1968) 70 Cal.2d 8, 12 [former § 166, subd. (6) (refusal to answer questions at trial); see current § 166, subd. (a)(6)].)

We agree with Appellant that "[t]he purpose of section 166[, subdivision ](c)(4) is to enhance punishment for repeat offenders," but it is directed to repeat offenders *of section 166, subdivision (c)(1)*, not repeat offenders of the crime that resulted in the criminal protective order that is subject to section 166, subdivision (c)(1). We likewise agree with Appellant that, for a true finding on a subdivision (c)(4) allegation, the evidence must establish that the "act of violence" be part of the violation of the subdivision (c)(1) protective order. As applied in the

present case, the court's instruction adequately takes into consideration this concern, by telling the jury that, to make a true finding based on " 'an act of violence against someone other than the protected party,' " the act of violence must have " 'facilitated the commission of or completion of the [section 166, subdivision (c)(1)] violation.' "

More specifically, as we explain, for purposes of section 166(c)(1)(B), the violence required to establish a true finding of a subdivision (c)(4) allegation is not linked (or limited) to the domestic violence victim identified in the criminal protective order. Section 166, subdivision (c)(1)—which deals with contempt, not domestic violence—identifies *six* separate types of criminal protective orders subject to contempt (§ 166, subds. (c)(1)(A)-(F)):

A. a protective order issued in response to a showing of intimidation of a witness (§ 166, subd. (c)(1)(A))—which has nothing to do with domestic violence;

B. a protective order issued as part of a grant of probation for a crime in which the victim is a victim of domestic violence (§ 166(c)(1)(B))—which deals exclusively with domestic violence (and is the subdivision under which the People charged, and the jury convicted, Appellant);

C. a protective order issued after a conviction in a criminal proceeding involving elder or dependent adult abuse (§ 166, subd. (c)(1)(C))—which is different from domestic violence;

D. a protective order issued after a conviction in a criminal proceeding of a sexual offense involving a minor victim (§ 166, subd. (c)(1)(D))—which has nothing to do with domestic violence;

E. a protective order issued in a family law proceeding restraining (a) specific acts of abuse, (b) ownership or possession of firearms or ammunition, (c) residence in the dwelling of another, or (d) the

37

specified behavior that was necessary to effectuate the protective order at issue (§ 166, subd. (c)(1)(E))—which may involve, but is not limited to, domestic violence; and

F. a protective order issued after a conviction for willful infliction of corporal injury resulting in a traumatic condition upon a specific class of victims related to the defendant, including a spouse, former spouse, cohabitant, former cohabitant, co-parent, or person with a former engagement or dating relationship (§ 166, subd. (c)(1)(F))—which may involve, but is not limited to, domestic violence.

In telling us that the purpose of the subdivision (c)(4) enhancement "is to protect victims of domestic violence," Appellant relies on *only four* of the *six* separately identified types of section 166, subdivision (c)(1) criminal protective orders to which the subdivision (c)(4) allegation applies. Appellant's argument fails to consider that the subdivision (c)(4) allegation also applies to at least two of the types of criminal protective orders that do not involve victims of domestic violence: a protective order issued in response to a showing of intimidation of a witness (§ 166, subd. (c)(1)(A)); and a protective order issued after a conviction in a criminal proceeding of a sexual offense involving a minor victim (§ 166, subd. (c)(1)(D)). In short, the same proof ("an act of violence") is used to establish a subdivision (c)(4) enhancement for all *six* types of protective orders under section 166, subdivision (c)(1), without consideration of whether the beneficiary of the protective order is a victim of domestic violence.

   b.  *Violence Contemporaneous with the Violation of the CPO*

Appellant's second objection to the court's responses to the jury's note Nos. 2 and 3 is that, for purposes of the subdivision (c)(4) enhancement, the instructions allowed the jury to consider acts of violence that did not occur at

the same time as the violation of the protective order.  As applicable here, according to Appellant, section 166, subdivision (c)(4) requires that the "violence must be contemporaneous with the conduct that violates the CPO." Although Appellant repeats that statement at least three times in his opening brief, he does not present any argument or authority in support of his contention.

Accordingly, to the extent this is a separate or distinct issue from the one discussed immediately above regarding violence against a third party (pt. III.D.3.a., *ante*), Appellant forfeited separate or distinct appellate consideration of this issue.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "]; Cal. Rules of Court, rule 8.204(a)(1)(B) [in an appellate brief, the party is required to "support each point by argument and, if possible, by citation of authority."].)  In any event, even if we were to consider the merits of this argument, the result would be no different since, as we explained at part III.D.3.a., *ante*, the instruction the court gave was not erroneous.

E.  *The Trial Court Was Not Required to Give a Unanimity Instruction for the Subdivision (c)(4) Enhancement*

Appellant argues that the trial court erred in not sua sponte instructing the jury that it had to agree unanimously as to which act constituted the violence for purposes of the subdivision (c)(4) enhancement allegation.  We are not convinced.

1.  *Background*

While the jury deliberated, after the court responded to jury note Nos. 2 and 3 concerning "an act of violence" for purposes of the subdivision (c)(4) enhancement (set forth in full at pt. III.D.1., *ante*), the court and counsel

discussed the need for a unanimity instruction. During the discussion, they considered whether a unanimity instruction was necessary as to both the specific violation of the CPO for purposes of the section 166*(c)(1)(B) violation* and the specific act of violence for purposes of the section 166, *subdivision (c)(4) enhancement*.

For purposes of the section 166(c)(1)(B) contempt, the court instructed the jury—consistent with CALCRIM No. 3500—that it had to agree as to which act violated the CPO for purposes of contempt. For purposes of the subdivision (c)(4) enhancement, however, the People did not elect a specific "act of violence"; and Appellant did not request a unanimity instruction.

2.      *Law*

Under the California Constitution, a unanimous jury verdict is required to convict a person of a crime. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) In particular, the jury must agree unanimously that the defendant is guilty of *a specific crime*. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.)

When a defendant is charged with a criminal offense, but the evidence suggests *more than one discrete crime*, either the People must elect among the crimes or the trial court must instruct the jurors that they all agree on the same criminal act. (*Russo, supra*, 25 Cal.4th at p. 1132; accord, *People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*) ["when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty"]; *People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

40

The requirement for a unanimity instruction " 'is intended to eliminate the danger that the defendant will be convicted even though there is *no single offense* which all the jurors agree the defendant committed.' " (*Russo*, *supra*, 25 Cal.4th at p. 1132, italics added.) By contrast, "where the evidence shows only *a single discrete crime* but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty."[21] (*Ibid.*, italics added.)

" 'The same reasoning should, in general, apply to enhancements as well as the crimes that underlie them.' " (*People v. Hernandez* (2009) 180 Cal.App.4th 337, 347-348.)

Despite the foregoing, "no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction . . . .' " (*Jennings*, *supra*, 50 Cal.4th at p. 679; accord, *People v. Hernandez* (2013) 217 Cal.App.4th 559, 572 (*Hernandez*).)

Because our consideration of whether the trial court should have given a particular jury instruction involves a mixed question of law and fact which is " 'predominantly legal,' " we review de novo whether the specific instruction was required. (*Hernandez*, *supra*, 217 Cal.App.4th at p. 568 [unanimity instruction].)

---

21    For example, unanimity is required in a forgery case where the prosecution alleges forgery of multiple documents under a single count, but not where the evidence shows different acts of forging and uttering involving a single instrument. (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 618-619.)

3. *Analysis*

Appellant's position is that, for purposes of the subdivision (c)(4) enhancement allegation, the trial court erred in failing, sua sponte, to give a unanimity instruction as to the "act of violence" that accompanied the violation of the CPO. According to Appellant, "the Count 2 enhancement allegation involved two discrete acts and two discrete victims"—namely, violence against Gloria and violence against Frank. We disagree. As we explain, because the violence against Gloria and the violence against Frank were part of a continuous course of conduct during the violation of the CPO, there was no need for the court to give a unanimity instruction as to the subdivision (c)(4) enhancement allegation.

Based on the instruction given in response to the jury's note No. 3, to have found the subdivision (c)(4) allegation true, the jury had to find that Appellant committed an act of violence against Gloria or a third party that "facilitated the commission of or completion of the violation" of the CPO.

The *only* evidence of potential violence establishes that it took place shortly before midnight on September 24, 2018, in or around Frank's apartment. When Appellant arrived unannounced at Frank's apartment, he let himself in. While still in the doorway, Appellant asked Gloria to step outside so that they could talk. Frank and Appellant exchanged words; and as Appellant took one of Gloria's arms in an attempt to lead her outside, Frank took her other arm in an attempt to keep her inside. During the commotion, which was just inside the door of the studio apartment, Appellant punched Frank in the eye, and Frank returned the punch. As Gloria attempted to get away from the two men (who only let go of her when they began hitting each other), her foot got stuck under the front door. Appellant then lifted Gloria from the floor and took her outside. Concerned because the

42

police had been called, Appellant again lifted Gloria, placed her over his shoulder, and carried her down Frank's driveway toward the street, as she screamed to be put down.

Significantly, Appellant affirmatively acknowledges what appears from each witness's testimony: Appellant fought with Frank and carried Gloria away "within a short time of one another." Appellant's acts of violence—whether directed to Frank or Gloria (or both)—were " 'so closely connected in time as to form part of one transaction.' " (*Jennings, supra,* 50 Cal.4th at p. 679; accord, *Hernandez, supra,* 217 Cal.App.4th at p. 572; see *People v. Mota* (1981) 115 Cal.App.3d 227, 231-234 [repeated acts of violence *during one hour* a continuous crime].) Here, as part of the "transaction" of contempt (i.e., the violation of the CPO), Appellant suggests that the acts directed to Frank and the acts directed to Gloria were "separate and distinct." We disagree. All of the violence occurred over a short period of time as Appellant was removing Gloria from Frank's apartment—i.e., from the time Appellant first grabbed Gloria's arm until he placed her down at the bottom of the driveway. For this reason, no unanimity instruction was required.[22] (*Jennings,* at p. 679; *Hernandez,* at p. 572.)

Appellant's authorities do not convince us otherwise.

In *People v. McNeill* (1980) 112 Cal.App.3d 330, the Court of Appeal reversed a conviction for assault with a deadly weapon, where, during the course of a murder, the defendant was alleged to have fired shots at the

---

[22] Appellant argues on appeal that trial counsel's assistance was constitutionally ineffective by failing to object to the lack of a unanimity instruction for the subdivision (c)(4) enhancement allegation. We disagree. Trial counsel was not constitutionally ineffective by failing to request a unanimity instruction that was not required based on the evidence in the case.

victim's four friends who witnessed the murder. (*Id.* at p. 334.) In *one count*, the information charged the defendant with assault, alleging that *each of the four friends* was a victim of the assault. (*Ibid*.) There, the trial court erred in not sua sponte giving a unanimity instruction, because "[a]ssaults upon separate victims, even though perpetrated by a single individual during an indivisible course of conduct, each comprise a separate, punishable offense." (*Id.* at pp. 334-336.) By contrast, here, each of the various acts of violence that occurred during "an indivisible course of conduct" did not "comprise a separate, punishable [enhancement]." Thus, *since there was an indivisible course of violent conduct* during which acts of violence occurred, no unanimity instruction was required. (*Jennings*, *supra*, 50 Cal.4th at p. 679; *Hernandez*, *supra*, 217 Cal.App.4th at p. 572.)

Appellant's other two authorities are inapplicable, because neither potentially involved an argument that the defendant's acts were part of a continuous course of conduct. (*People v. Wesley* (1986) 177 Cal.App.3d 397, 399, 401 [the jury found the defendant guilty of possessing for sale "cocaine *or* heroin"; without a unanimity instruction "some of the jurors might [have] base[d] their verdict on the cocaine while the other jurors base[d] theirs on the heroin"]; *People v. Crawford* (1982) 131 Cal.App.3d 591, 593-595, 599 [the jury found the defendant guilty of one count of possession of a firearm by an ex-felon; the evidence established two firearms in the defendant's bedroom during one search and two different firearms during a second search of another person's bedroom later the same day; a unanimity instruction was required, because "the acts of possession were not factually identical" in terms of location].) In contrast to *Wesley* and *Crawford*, in the present case, in establishing the requisite "act of violence" to constitute the subdivision (c)(4) enhancement, the prosecution presented evidence of

multiple acts of violence—all of which " 'are so closely connected in time as to form part of one transaction.' " (*Jennings*, *supra*, 50 Cal.4th at p. 679; accord, *Hernandez*, *supra*, 217 Cal.App.4th at p. 572.)

F.     *Without Individual Instances of Trial Court Error, There Can Be No Prejudice from "Cumulative Error"*

Appellant contends that, "[e]ven if the Court does not find any single error prejudicial, the judgment should be reversed because the cumulative effect of the errors rendered the trial fundamentally unfair and cannot be shown harmless beyond a reasonable doubt. . . .  [¶]  Here, cumulative prejudice from multiple errors requires reversal."

Under the "cumulative error" doctrine, " 'a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 523.)  Here, however, because Appellant has not established any one error by the trial court, Appellant cannot establish what he characterizes as a "cumulative effect of the errors" or "cumulative prejudice." (*Ibid.*; *In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits . . . cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)

G.     *The Two One-Year Sentence Enhancements Should Be Stricken*

Appellant argues that each of the two one-year terms imposed based on Appellant's prison priors should be stricken as a result of a change in the law. The Attorney General agrees.  As we explain, because the change in the law ameliorates this portion of Appellant's sentence and the judgment in this case is not yet final, we conclude that the new law is retroactive and will modify the judgment accordingly.

1. *Background*

After the filing of the jury's verdict, Appellant admitted the truth of the two prior prison terms alleged in the information for purposes of former section 667.5, subdivision (b). Based on this admission, at sentencing, the trial court added two consecutive one-year terms—one for each of the two prison priors under former section 667.5, subdivision (b).

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b). (Stats. 2019, ch. 590, § 1.) By this revision, the Legislature "amend[ed] section 667.5, subdivision (b) to limit its prior prison term enhancement to only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b)." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681; accord, *People v. France* (2020) 58 Cal.App.5th 714, 718 [same], 729 ["Senate Bill 136 eliminated an enhancement for defendants who served prior prison terms for non-sexually violent offenses"].)

On January 1, 2020, the effective date of Senate Bill No. 136, this appeal was pending.

2. *Law*

The rule in California is that a statute which ameliorates the punishment for an offense will generally apply retroactively to any case in which the judgment is not yet final before the effective date of the statute. (*In re Estrada* (1965) 63 Cal.2d 740, 742, 744-745 (*Estrada*).) As our Supreme Court explained:

> "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute

46

imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Id*. at p. 745.)

In short, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (*Id*. at p. 748.)

Under *Estrada*, *supra*, 63 Cal.2d 740, " 'for the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 306.) Stated differently, as we recently ruled: "For purposes of the *Estrada* rule, a judgment is not final so long as courts may provide a remedy on direct review." (*People v. Jennings*, *supra*, 42 Cal.App.5th at p. 682 [retroactive application of § 667.5, subd. (b)].)

3.    *Analysis*

"By eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses." (*People v. Jennings*, *supra*, 42 Cal.App.5th at p. 682.) Therefore, we conclude, and the parties agree, that under the *Estrada* rule, Senate Bill No. 136's amendment to section 667.5, subdivision (b) applies retroactively to all cases not yet final as of its January 1, 2020, effective date. Because Appellant's case was not final as of that date, he is entitled to the ameliorative benefit of Senate Bill No. 136's amendment to section 667.5, subdivision (b).

47

Accordingly, we will modify the judgment by striking the two one-year prior prison term sentencing enhancements under section 667.5, subdivision (b).

## IV.  DISPOSITION

The two one-year sentencing enhancements under section 667.5, subdivision (b) are stricken from the judgment.  In addition, paragraph 1 of the abstract of judgment is amended to show that Appellant was convicted by a jury—i.e., not as part of a plea.  The court shall forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


IRION, J.

WE CONCUR:



McCONNELL, P. J.



BENKE, J.

48

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARK AARON SORDEN,<br><br>    Defendant and Appellant. | D076458<br><br><br><br>(Super. Ct. No. SCN393022)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 18, 2021, and modified on June 15, 2021, was not certified for publication. It appearing the opinion as modified meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion as modified meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said modified opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties